No. 83-558

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

STATE OF MONTANA,

        Plaintiff and Respondent,

-vs-

KENT ALLEN SANDERSON,

        Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Carbon,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Kinnard & Woodward; Vern Woodward argued,
        Billings, Montana

    For Respondent:

        Mark Murphy argued, Special Deputy County Atty.
        for Carbon County & Asst. Atty. General, Helena
        Clay Smith argued, Asst. Attorney General, Helena,
        Montana

ON REHEARING

Submitted: November 21, 1984

Decided: January 4, 1985

Filed: JAN 4 1985

*Ethel M. Harrison*

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Appellant, Kent Allen Sanderson, appeals from a judgment on a jury verdict of guilty of sexual intercourse without consent. The Thirteenth Judicial District Court, Carbon County, sentenced him to ten years on the one count. We affirm.

We handed down the original Opinion in this cause on November 8, 1984. Subsequently a petition for rehearing and response to that petition were filed with this Court. After careful consideration, we have concluded that the Opinion should be revised. As a result we now withdraw the original Opinion which was decided November 8, 1984, and substitute therefor the following Opinion.

There are essentially three parties involved in this case: the defendant, the victim and the victim's best friend. Because the victim and her friend were just sixteen years of age at the time of the incident we shall refer to them by their initials: K.D. and D.J. respectively.

K.D. began her morning on March 29, 1982, by driving her mother to work and her younger sister to school. She then met her best friend, D.J., and the two of them decided not to attend classes that day. They were both juniors at a Billings high school. A decision was made to drive to Red Lodge where they expected to meet with some friends who had gone skiing for the day. Around 10:00 a.m. the two girls left Billings and proceeded east to Laurel on the freeway and then south toward Red Lodge. About five miles south of Laurel, the car broke down and eventually a van driven by appellant Sanderson stopped. After examining the car and

trying unsuccessfully to start it, Sanderson offered the girls a ride into Laurel. There, he said, he would attempt to locate a tow chain so they could tow the car into town.

Sanderson had originally intended to cash a check in Laurel so the trio's first stop was at a bank. From there they drove to Adeline's Cafe where Sanderson met a friend whom he thought might either have access to a tow chain or know where one might be found. According to Sanderson's testimony it was here the girls indicated they were students at Eastern Montana College.

The party stopped at the Suds Hut, a local tavern, where Sanderson bought a pitcher of beer. K.D. testified that Sanderson told her and D.J. if anyone asked them for identification because of the beer they should say they were college students but did not have any identification with them. It was K.D.'s contention at trial that Sanderson knew she and D.J. were high school students. Sanderson, on the other hand, reiterated his belief that they were eighteen or nineteen years old and were college students.

Everyone agreed that while at the Suds Hut the conversation turned to drugs. K.D. testified that a fairly lively conversation occurred between D.J. and Sanderson concerning the sale of marijuana. K.D. denied taking part in that conversation. D.J., however, said both she and K.D. conversed with Sanderson about the possibility of selling drugs. Sanderson's story is a bit different. According to his testimony, K.D. told him they were not really going to Red Lodge to ski but were going to pick up some mescaline. Sanderson said he told the girls he could get some marijuana for them to sell and they told him they could sell a pound.

From the Suds Hut the trio went across the street to a convenience store where Sanderson bought beer and wine. They drove from there to the Palm Beach Supper Club and, according to Sanderson, they smoked two marijuana cigarettes, or joints, on the way. The purpose of the stop at the supper club was for Sanderson to make a telephone call to set up a deal to obtain a quantity of marijuana for the girls to sell. The contact, who worked at a ranch, said he had a small sample on hand.

Sanderson testified that after obtaining a chain at a service station, they drove to the ranch where they were given a one-half ounce bag of marijuana to sample. Then, Sanderson said, they drove to the girl's parked car.

Everyone agreed that once they reached the parked car they could not find a place to hook the chain. They were able to start the car, however, and drove it a short distance before it quit again. They decided to leave it parked alongside the road.

According to Sanderson's testimony, after leaving the stalled car the second time they returned to the Palm Beach supper club. Since it was approximately 3:00 p.m., the time they normally would return home from school, the girls thought they should call home. Sanderson loaned them money to call. Now, Sanderson said, they drove to the ranch and obtained the pound of marijuana for the girls to sell. Sanderson also stated that it seemed to him the girls were more interested in getting the pound of marijuana than they were in getting their car home.

Once they had the marijuana in hand the three parties began the trip back to Laurel. Sanderson testified that on

-4-

the way to Laurel he pulled off the road at a brick house, later identified as the Donald Blackburn residence. He testified he stopped to talk to the girls about when and where he could pick up the money the girls would ultimately realize from the sale of the marijuana. Sanderson said he emphasized the fact to the girls that he really wanted to trust them to get the money for him since he was giving the marijuana to them on credit. He also admitted telling them if he did not get the money back from them then somebody else would, a statement the girls said they perceived as a threat. He further admitted at trial that he may have been suggestive at this point in the conversation. Sanderson insists at this point K.D. asked him if sex would help him trust her for the pound of marijuana. He testified she then took her pants off and had intercourse with him in the back of the van, but only once. He said D.J. was in the front of the van during the act. Finally, Sanderson testified that he took the girls to Laurel and left them at the Safeway store.

Tracing the girls' testimony from the point where the second attempt to start the car was made, a somewhat different account of events unfolds. K.D. testified that after she and D.J. abandoned the car for the second time, they returned to the Palm Beach supper club with Sanderson. Both girls called their mothers with money borrowed from Sanderson. Sanderson told them his father had a fifth-wheel trailer that he might be able to borrow to use to haul the car into town. The trio drove from the supper club to a spot along the river where they all smoked some marijuana before proceeding to the El Rancho Inn. K.D. saw a clock at

that location and noticed it was 5:30 p.m. From there the three drove to the ranch and were unsuccessful in obtaining the trailer. Returning from the ranch, K.D. said Sanderson parked the van in a driveway near a brick house and just sat there for several minutes without talking. He then got into the back of the van with the girls and told the girls they were going to sell the marijuana for him. They refused, and Sanderson grabbed D.J. and pushed her to the back of the van. K.D. tried to get out of the van but was prevented from doing so when Sanderson grabbed her arm and twisted it behind her back. K.D. said she continued to try to escape but D.J. told her to stop for fear that Sanderson would hurt them. D.J. also testified Sanderson kept saying he was doing this to see if he could trust them. K.D. said Sanderson pushed both of them to the floor of the van and laid on top of both of them simultaneously. He began kissing and fondling D.J., but stopped when she told him she was menstruating. Sanderson then turned his attention to K.D. According to K.D.'s account, Sanderson took her pants off and had sexual intercourse with her and then got off of her, began kissing D.J. again and then had sexual intercourse with K.D. for a second time. After the second act of sexual intercourse, Sanderson drove the girls to Billings and dropped them off at the Holiday Inn.

In their statements to authorities, the two girls at first gave conflicting stories. K.D.'s story was basically as related above. D.J., on the other hand, initially told law enforcement officers that a third girl had accompanied them to Laurel. She later admitted that was a lie designed for the benefit of her parents. She had said the reason

-6-

they went to Laurel was to give the girl a ride home.

Appellant Sanderson presents the following issues on appeal:

(1) Whether the District Court erred by denying appellant's motion to dismiss for lack of a speedy trial.

(2) Whether the District Court erred by denying appellant's motion to provide for attendance of a witness.

(3) Whether the District Court committed reversible error by failing to give appellant's offered instruction No. 8 concerning prior inconsistent statements.

(4) Whether the verdicts rendered and the evidence presented are so inconsistent as to invalidate the verdict of guilty on count one of the information.

(5) Whether the closing argument of the State violated appellant's right to a fair trial.

(6) Whether the District Court committed reversible error by failing to give appellant's offered insturction No. 11 setting forth the material allegations of the information.

(7) Whether the District Court committed reversible error by denying appellant's motion to suppress evidence.


I

Appellant argues that because of the 391 day delay from the time of arrest on March 30, 1982, until the commencement of trial on April 25, 1983, he was denied his constitutional right to a speedy trial. We disagree.

Appellant was arrested on March 30, 1982, arraigned on April 5, 1982 and then released on bail. Trial was originally set for June 21, 1982 but on June 8, 1982,

appellant, through his original counsel, requested and received a continuance of the trial date until August 16, 1982. On July 13, 1982, appellant's bond was revoked and he was reincarcerated in the Carbon County Jail were he remained until being released on his own recognizance on August 2, 1982. On August 24, 1982, appellant asked for and received a second continuance of at least sixty days. Plea negotiations further delayed matters and on December 22, the trial judge received notice from Sanderson stating he did not want to accept the negotiated plea arrangement. In that same letter Sanderson's attorney stated his intention to withdraw as his attorney. Appointment as deputy county attorney for Carbon county was cited as the reason for the withdrawal. On January 12, 1983, Sanderson's new attorney was appointed. By order mailed January 31, 1983, the District Court set appellant's trial date for April 25, 1983. On March 17, 1983, appellant's counsel filed a motion to dismiss on the basis appellant had been denied his constitutional right to a speedy trial. The District Court denied the motion on April 19, 1983, and trial commenced on April 25, 1983.

The right to a speedy trial is guaranteed by both the Sixth Amendment to the United States Constitution and by Article II, section 24 of the 1972 Montana Constitution. Moreover, the federal provision has been imposed upon the several states by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Klopfer v. North Carolina (1967), 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1.

Having established appellant's right to a speedy

trial, we now consider whether that right has been denied.

Both appellant and respondent agree that the test to be used in determining whether the right to a speedy trial has been denied was enunciated more than a decade ago by the United States Supreme Court in Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101. In that decision the Court stated:

> "The approach we accept is a balancing test in which the conduct of both the prosecution and defendant are weighed.
>
> "A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker 407 U.S. at 530.

After some explanation of the four factors the Court continues:

> "We regard none of the four factors identified above as either a necessary or sufficient condition to the findings of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." Barker, 407 U.S. at 533.

In the present case it is essential that we carefully engage in the difficult and sensitive balancing process which is described in Barker. We note that this Court initially relied on Barker in State v. Sanderson (1973), 163 Mont. 209, 516 P.2d 372, in which we adopted the usage of the four factors and the balancing test which is necessary in

-9-

reaching a final conclusion.

We note that the delay here was 390 days which is sufficient to trigger a speedy trial inquiry. State v. Kelly (Mont. 1983), 661 P.2d 26, 40 St.Rep. 364. We conclude that the reasons given for the delay were not sufficient to terminate our inquiry at that point. In addition the State agrees with the defendant's contention that he asserted his right within the appropriate time.

This leaves as the only remaining Barker factor, the question of prejudice. The United States Supreme Court in United States v. Ewell (1966), 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627, set forth three interests which the Sixth Amendment was designed to protect in cases such as these. The first was the question of undue and oppressive incarceration. Here the defendant was incarcerated for twenty-seven days which the record does not disclose to be oppressive. The next factor is the presence of significant anxiety and concern accompanying public accusation. While defendant did testify as to his anxiety, there is substantial evidence in the record to allow the District Court to conclude that in fact his anxiety was very limited. However, we do not turn the case on this point. We do note that there was nothing in the record to justify the conclusion that the defense of the defendant was impaired. While defendant argued that there were diminished memories on the part of his witnesses and that a key witness moved out of the state, the prosecution showed that the key witness left the state in August, 1982, and his absence was not caused by any delay in trial. This was buttressed by the failure on the part of the defendant to attempt to depose or otherwise preserve testimony of witnesses.

As a part of the balancing process required under Barker, we have reviewed the record with regard to the trial delay, and have concluded that there is substantial evidence

-10-

to show that the defendant may not have wanted a speedy trial and that the defendant in fact was responsible for the delay in substantial part. As a result we have concluded that defendant is in a position similar to Mr. Barker in Barker v. Wingo in that the record demonstrates that the defendant did not really desire a speedy trial. While this is a close and difficult question, applying the sensitive balancing process required under Barker, we conclude that the defendant in this case was not deprived of his constitutional right to a speedy trial.

## II

Appellant's second issue on appeal is whether the District Court erred by denying his motion to provide for attendance of a witness. On April 21, four days before trial, counsel for appellant filed a motion to provide for the attendance of a defense witness, Stevenson, who was at that time residing in Massachusetts. The State resisted the motion on the grounds that another defense witness would testify to the same facts. Because of that redundancy, coupled with cost considerations, the motion was denied.

The State contends the motion was properly denied for two reasons. First, appellant failed to comply with the procedure for subpoenaing out-of-state witnesses as set forth in section 46-15-113, MCA. Second, the out-of-state witness would have duplicated testimony already at hand and as such would not have qualified as a material witness under the statute.

The appellant insists he was denied due process by the District Court's failure to provide for the attendance of the witness. According to appellant access to the witness was denied solely on the basis of county financial consideration, and cites a long line of United States Supreme Court cases to buttress his due process claim.

- 11 -

According to section 46-15-113, MCA, the decision whether to compel the attendance of an out-of-state witness rests solely within the discretion of the trial court judge. This Court has addressed section 46-15-113, MCA, only once and then in a manner unrelated to the issue before us today. The Court of Appeals of New York, People v. McCartney (1976), 38 N.Y.2d 618, 345 N.E.2d 326, 381 N.Y.S.2d 855, found itself face to face with a statute almost identical to ours: "A request that the Trial Judge issue a certificate pursuant to [the statute] seeking the compulsory attendance of a witness in another state is addressed to the discretion of the trial judge." That Court further held that " . . . in the absence of an abuse of discretion we may not overturn [the trial judge's] determination of nonmateriality." McCartney, 345 N.E.2d at 330. See also State v. Etheridge (1968), 74 Wash.2d 102, 443 P.2d 536, (Issuance of certificate to compel attendance of out-of-state witnesses is not mandatory but largely discretionary); and State v. Edwards (1970), 471 P.2d 843, 3 Or.App. 179, (Issuance of certificates for out-of-state witnesses within discretion of trial court).

The only procedure to subpoena an out-of-state witness is set forth in section 46-15-113, MCA, applied to the instant case. The appellant failed to make the procedure set forth in the statute, or otherwise Stevenson had, or would be, properly subpoenaed. Appellant's motion was faulty, and properly denied.

In addition, it is clear from the record that the testimony of Mrs. Watson (the ex-wife of the absent witness), given by deposition and read to the jury, covered the events that occurred in Adeline's Cafe. Therefore, we

find no abuse of discretion in not bringing Stevenson back from Massachusetts.

If appellant's contention was true that the trial court judge had denied his motion solely on the basis of county financial standing, then an injustice would have been done. In State v. Harris (1980), 47 Or. App. 665, 615 P.2d 363, the Court of Appeals held that the defendant made a sufficient showing that his proposed out-of-state witnesses were material and therefore the trial court erred in refusing to provide funds to secure their attendance. The case at bar is dissimilar however. Here the trial judge had ample reason to conclude appellant's proposed witness was nonmaterial. We hold that a trial court's finding as to the materiality of a witness when applying this particular statute will not be disturbed absent a clear showing of abuse of discretion. Accordingly we reject appellant's argument on this issue.

### III

Next appellant contends the District Court committed reversible error by failing to give offered instruction No. 8 concerning prior inconsistent statements.

There is a dearth of case law regarding jury instructions on prior inconsistent statements not only in Montana but elsewhere as well. The lone Montana case, heavily relied upon by defendant, is State v. Taylor (1973), 163 Mont. 106, 515 P.2d 695. The defendant in Taylor was charged with second degree homicide arising from the death of a two-year-old child. The child's mother gave testimony at trial which was inconsistent with statements she had made

-13-

prior to trial. The defendant appealed his conviction contending the trial court erred by not including in its jury instructions his request that prior inconsistent statements are one of the factors which the jury should consider as possibly repelling the presumption that a witness speaks the truth. This Court agreed with the defendant in that case and relied on section 93-1091-12, R.C.M. 1947, which specifically provided: "A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony. . . " We concluded:

> "Clearly, such an instruction would have been proper and in a case, such as this, when the State's principal witness had admittedly made a number of prior inconsistent statements, it would seem particularly appropriate. The giving of the instruction with the defendant's requested inclusion regarding prior inconsistent statements would better accord with the accepted principle of fully and clearly instructing the jury as to the specifics of the law applicable to the case." Taylor, 515 P.2d at 704.

We must distinguish Taylor from the case at hand for several reasons. First in Taylor, the inconsistent testimony went directly to the heart of the issue at bar: whether the defendant had, in fact, caused the death of the victim. In the instant case, the inconsistencies in the testimony of D.J. contain no probative value. We agree with respondent's conclusion that " . . .not only was [sic] none of her inconsistencies material to whether the defendant's intercourse with the victim was consensual, but they were also corrected in a later pretrial statement."

Second, and most persuasively, the trial court instructed the jury more than sufficiently on the matter in

-14-

its instruction No. 1. In that instruction the following was read to the jury: "Every witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which he testified, by the character of his testimony, or by evidence affecting his reputation for truth honesty, integrity, or his motives or by contradictory evidence. (Emphasis is ours.) Appellant's requested instruction No. 8 would have been identical to the above instruction with the following addition: "Furthermore, this presumption may be rebutted by evidence that the witness has made, at other times, statements inconsistent with his present testimony." We find that no error was committed by the court below, reversible or otherwise, by refusing to add this redundant sentence to an already complete and competent instruction.

IV

Appellant's fourth issue on appeal deals with whether there was sufficient evidence before the jury upon which they based their verdict. More specifically, appellant urges us to find the verdict was so inconsistent with the evidence as to invalidate the jury's findings.

Appellant was charged with two counts of sexual intercourse without consent. The victim testified that appellant had forced her to have two separate acts of sexual intercourse with him. The appellant insists there was only one act and that act was consensual.

This Court has previously faced this issue in recent cases, State v. Thompson (1978), 176 Mont. 150, 576 P.2d 1105; State v. Doe (1976), 143 Mont. 141, 146, 388 P.2d 372,

375. In _Thompson, supra,_ we noted in following _Boe, supra_ that "where separate acts are charged in an information, and each act is a separate offense, an acquittal or conviction of one or more counts does not affect the other counts. . ."

The jury, after deliberating for approximately nine hours, found appellant guilty on count one and not guilty on count two. Appellant apparently feels that either the jury believed his story or it believed the victim's but could not have believed a little of each. Appellant argues if the jury believed his story, the verdict should have been not guilty on both charges. If the jury believed the victim's story, the verdict should have been guilty on both counts.

The decision we are therefore called upon to make is whether the jury was within its province to believe the victim's testimony to the point of convicting appellant of sexual intercourse without consent, while at the same time disbelieving the victim's testimony as to how many acts were perpetrated.

The question is well settled in Montana. A long line of cases state emphatically that this Court, when assessing the sufficiency of the evidence upon which a jury has based its verdict, must view that evidence in a light most favorable to the prosecution. Most recently this Court held when ". . . assessing the sufficiency of the evidence, this Court must give it all of the probative effect toward conviction that it will support. State v. Fitzpatrick (1973), 163 Mont. 220, 227, 516 P.2d 605, 610." State v. Hammons (Mont. 1983), 664 P.2d 922, 926, 40 St.Rep. 884, 888. This Court will not substitute its judgment for that

-16-

of the jury; a jury which, in this case, was able to view firsthand the evidence presented, observe the demeanor of the witnesses and weigh the credibility of each party. Therefore we reject appellant's contention as to the validity of the verdict.

V

Appellant contends that the following statements on closing argument by the State were so inflamatory and prejudicial as to deny him his right to a fair trial:

> "In order to find the defendant not guilty, you have to tell K.D., first, that she was a drug pusher; second that she is a slut; and third, that she is a liar. You have got to tell her that you believe the defendant when he says she laid in back of the car and took her pants off and indicated for him to come back. And, if you can believe that, ladies and gentlemen, from the testimony that was presented in this case, you can acquit him, and let him go."

At the time of trial, section 46-20-702, MCA, provided that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." This has subsequently been modified.

By his testimony and evidence, appellant attempted to convince the jury that K.D. was interested in selling drugs and was therefore a drug pusher, that she had voluntarily offered herself sexually without any encouragement on the part of the appellant, which certainly suggests that parts of our society would class her as a "slut" and last appellant contended many times that K.D. had lied to the jury. The testimony of K.D. contradicted these contentions on the part of the appellant.

While it is not true that in order to find the

-17-

appellant not guilty, the jury would have to tell K.D. that she was a drug pusher, slut and liar this is a matter of argument to the jury and not legal instruction by the court. We certainly do not condone any such misstatement on the part of the prosecution as to the standard to be applied for conviction or aquittal. However, we do recognize that a comment of this nature upon the evidence submitted by the appellant would have been appropriate so far as the prosecution is concerned. In weighing the effect of the argument, we have examined the record and concluded that the error on the part of the prosection in making this argument did not affect the substantial rights on the part of the appellant and, therefore, may be disregarded.


VI

Appellant next contends the District Court committed reversible error by failing to give his offered instruction No. 11 setting forth the material allegations of the information. He relies on section 46-11-401(1)(c)(iv), MCA, which reads: "Form of charge. (1) A charge shall: . . . (c) charge the commission of an offense by: . . . (iv) stating the time and place of the offense as definitely as can be done . . . " Because the information charging him stated the offense took place " . . . between Rockvale and Edgar . . . " appellant claims it was insufficient when held up to section 46-11-401(1)(c)(iv), MCA.

The test of the sufficiency of an information is whether the defendant is apprised of the charges brought against him and whether he will be surprised. State v. Bogue (1963), 142 Mont. 459, 384 P.2d 749. The test of the

sufficiency of an information is whether a person of common understanding would know what is intended to be changed. State v. Board (1959), 135 Mont. 139, 337 P.2d 924. It is clear from the record that appellant was adequately apprised of the charges brought against him, that appellant was not surprised by the charges and that he possessed such common understanding as enabled him to know what the charges against him were intended to be. Indeed, the public policy underlying the technical requirements of the charging statute is to afford defendant due process of law; that is to fairly apprise them of what crime they are being charged with in order that they might fully defend against it. Here, appellant knew full well from the information what crime he had been charged with. His crime was not part of a common scheme involving many incidents over a long period of time. He had not committed so many similar crimes in the general vicinity that he was confused as to just which sexual intercourse without consent the prosecution was referring to. Accordingly we disagree with appellant's contention of error in this issue.

## VII

The District Court committed reversible error, appellant contends, by denying his motion to suppress evidence. Appellant moved to suppress evidence seized pursuant to the issuance of a search warrant he claims was defective on its face. However, we need not decide this issue since the only evidentiary significance of the property seized was to establish the physical presence of the victim in the van. Because appellant admitted her

presence and the act of sexual intercourse, the property seized had no evidentially prejudicial impact and did not contribute in any way to the conviction. Therefore the question is moot.

The judgment of the District Court convicting appellant of one count of sexual intercourse without consent is affirmed.

_____
Justice

We concur:

_____
Chief Justice


_____

_____

_____
Justices

_____
Honorable John S. Henson,
District Judge, sitting in
place of Mr. Justice L.C.
Gulbrandson.


Mr. Chief Justice Frank I. Haswell:

I concur in the result.

_____
Chief Justice