No. 98-186

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 22

STATE OF MONTANA

Plaintiff/Respondent,

v.

DONALD AZURE

Defendant/Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Lawrence A. LaFountain, Belgrade, Montana

For Respondent:

Mike McGrath, Montana Attorney General, Jennifer Anders, Assistant Montana Attorney General, Helena, Montana; Brant S. Light, Cascade County Attorney, Great Falls, Montana

———————————————————————

Submitted on Briefs: August 9, 2001

Decided: February 12, 2002

Filed:

_____

Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

1. ¶In February, 1997, Donald Azure (Azure) was charged with deliberate homicide, attempted deliberate homicide, and criminal mischief, a misdemeanor. A jury found Azure guilty of deliberate homicide of John Cavill; mitigated attempted deliberate homicide of Lois Cavill; and criminal mischief, a misdemeanor. Azure's motion for a new trial or modified verdict was denied, and the District Court sentenced Azure to 110 years for deliberate homicide with the use of a weapon, 12 years for mitigated attempted deliberate homicide with the use of a weapon, and 6 months for criminal mischief, with all sentences to run consecutively. Azure appeals the court's denial of his motion for a modified verdict, and alleges improper jury impanelment procedure and prosecutorial misconduct. We affirm.

2. ¶We restate the issues as follows:

1. Whether Azure's allegation of an unlawful jury impanelment may be reviewed on direct appeal, when no objection was raised at trial;

2. Whether Azure's allegations of prosecutorial misconduct may be reviewed on appeal, when no objection to the conduct was raised at trial; and

3. Whether the District Court erred when it denied Azure's motion for a modified verdict.

## FACTUAL AND PROCEDURAL BACKGROUND

1. ¶Azure and Lois Cavill (Lois) were married in 1981. According to Lois, the marriage began to deteriorate when Azure started drinking, and in 1987, she filed for divorce following an incident when Azure threatened to kill her. Lois later

withdrew the papers upon promises by Azure to stop drinking. In December of 1996, Azure was drinking again and because she felt threatened, Lois obtained a restraining order to keep Azure away from her. However, Azure violated the restraining order on January 6, 1997, when he broke into Lois' residence and was waiting on the couch when Lois came home. Azure pointed a gun at Lois, and he told her that he had one shell in the chamber for her and one for him. Lois convinced Azure she would not leave him, and that she would help him. Azure stayed at the house that night, and the couple met with a marriage counselor the next day. However, Lois decided to go through with divorce proceedings after Azure accused her of having an affair. Lois left the residence on January 13, 1997, and went to Plains, Montana, to stay with her brother, Fred Cavill (Fred). According to Fred, when Azure later called for Lois at his house, Azure told him that if he couldn't talk to Lois, Azure would blow her head off, burn her house down, and shoot himself.

2. ¶On February 3, 1997, the couple reached a property settlement in their divorce; Azure received $5,500.00, the van, and his truck, while Lois received the house and a truck. Lois' brother John Cavill (John) came to Great Falls to help Lois pack her belongings and move to Plains. On February 13, while Lois and John were packing her things, Lois observed Azure's van drive by the house several times. Several neighbors also observed Azure's van in the area that day.

3. ¶Later on February 13, at approximately 8:30 p.m., a prospective buyer for Lois' house, Kathy Carson (Carson), discovered the front tires of her truck and the rear tires of John's truck had been slashed with a large knife while she was looking at the house. Carson, a local police officer, was off duty at the time. After learning about Lois' estranged relationship with Azure and past incidents of threatening behavior by Azure, Carson arranged to have a patrol officer periodically check on the residence.

4. ¶At approximately 8:58 p.m., Great Falls City Police Officer, Steven Pre'tat (Pre'tat), responded to the call regarding the slashed tires. After Pre'tat examined the tires, Lois showed him a note that Azure had written to her that read: "Tell me something or it could be bad. I love you. I don't want trouble." Pre'tat looked for Azure's van in the area, but did not locate it. Pre'tat informed Great Falls Police Officer Doug Otto (Otto) of the situation, and advised him to look for Azure in the area, since Otto was scheduled for the night shift.

5. ¶Shortly after 10:00 p.m., a neighbor who lived just down street from Lois' house observed Azure's van slowly drive up in front of her house without its lights on. The van was parked for about ten or fifteen minutes and then proceeded towards Lois'

residence.

6. ¶About this same time, police officer Otto came on shift and proceeded to check on Lois' residence. When he arrived, Otto observed Azure's van parked in front of Lois' house, but could not see anyone around the vehicle. The officer positioned his patrol car so he could observe the residence and turned his headlights off. While Otto was parking his patrol car, he heard a gunshot and saw a muzzle flash, and then immediately heard two more shots.

7. ¶At approximately 10:20, p.m., Lois was in the back bedroom when she heard John holler something about trouble, and as she ran towards the kitchen, she heard the first shot. Lois called to John but he did not respond. Lois grabbed a gun to try and protect herself, but while she was loading a shell, the gun jammed. Lois then heard another shot and hid behind some boxes in the dining room area. When Lois reached up to shut off the lights, she saw John lying in the kitchen, and then looked out of the window and saw Azure in his van with Otto's patrol car right behind it.

8. ¶After the shots, Otto called for back-up and then observed a man, later identified as Azure, get into the van and drive off. With his lights and siren activated, Otto pursued the van for several minutes, observing the van fail to stop at stop signs and stop lights. Other law enforcement officers joined the pursuit and at one point, threw a stop stick in front of Azure's van. Although the stick punctured a tire on the van, Azure continued to drive. Eventually Azure stopped his van at a local bar, where he got out and walked toward the bar. Azure was sprayed with pepper spay and then subdued by Otto and another officer. Otto then arrested Azure and Great Falls City Police Officer John Cathell (Cathell) advised him of his Miranda rights. Otto and Sergeant John Cameron (Cameron) testified that Azure did not appear agitated or emotionally upset at the time of his arrest. Cameron testified that when he looked inside Azure's van, he observed a bolt action rifle lying between the van's front seats.

9. ¶While Azure was being pursued, several Great Falls City Police officers and detectives responded to Lois' residence. Upon entering the house, officers observed John lying dead on the kitchen floor, with a massive gunshot wound to his left eye. His feet were underneath the kitchen sink kick board, and the officers observed one bullet hole in the kitchen window, which was positioned above the sink. According to Detective William Bellusci (Bellusci), John was standing in front of the kitchen window and leaning towards the sink when he was shot. The officers also observed two bullet holes in the dining room window.

10. ¶Two shell casings matching Azure's rifle were found on the lawn, while a third was found on the van's floor on the passenger's side. The rifle between the seats of Azure's van was a .270, and a partially full box of .270 ammunition was found in the

van. The scope affixed to the rifle was set for close range, for shooting a distance of 25 to 30 feet. Detective Bellusci testified that when looking through a scope at a window that was lit up at night, the light would silhouette anything within the house.

11. ¶After his arrest, Otto transported Azure to the police department where he waited in a holding cell. Otto testified that Azure did not appear emotionally upset in the holding cell, nor did Otto observe anything unusual about Azure's behavior. While in the cell, Azure initiated a conversation with Cathell who informed Azure of his Miranda Rights again. However, Azure continued to converse with Cathell, stating, "I'm in the process of getting divorced right now and this is what this is all about." However, Azure also stated that he didn't remember anything, saying, "The only thing I remember is I'm driving down the street and a bunch of cops behind me;" but then asked, "Did I run over somebody or what?" Soon after, Azure states again that this all about the divorce, and adds, "I went and got drunk. I don't know what happened," and then, "I'll be sixty years old pretty soon, and I can't believe I did something like that." However, Azure again refers to hurting someone: "Boy! I hope nobody got hurt. Shit! That would really bum me out if somebody got hurt. Did I get in a wreck or what?" Finally, Azure also said, "I can't believe I'd do something like this. And I don't even know what I did."

12. ¶Shortly after his last statement, while still in the holding cell, Azure complained of chest pain, but told the paramedics that he drank all night and added, "I don't think I'm having a heart attack." During the transportation to the hospital, Azure voluntarily told Officer Cathell, "God, I hope I didn't hurt anyone too bad. If I did, I hope I have a heart attack." Azure was treated and released and eventually transported to the County Jail. While being booked at the jail, Azure voluntarily said to the booking officer, several times, "I can't believe I shot him." According to the officer, Azure blurted out, "What makes a man shoot someone like I did?" and "All of this happened because of the divorce." The booking officer testified that at the time he was being booked into the jail, Azure was aware that he was charged with deliberate homicide.

13. ¶Azure claims that the statements he made in the holding cell were made after he was given a citation and told that he was charged with "first degree homicide," and that his chest pains were related to finding out he was charged with killing John Cavill. Officer Cathell testified that when Azure was arrested at the bar, none of the officers told Azure that a person had been killed. According to Cathell, and verified by the contents of the videotape of Azure while he was in the holding cell, no one told Azure that John had died while Azure was in the holding cell.

14. ¶On February 27, 1997, Azure was charged by Information with the following Counts: (I) deliberate homicide of John Cavill; (II) attempted deliberate homicide of Lois Cavill; and (III) criminal mischief, a misdemeanor, for slashing the tires on two trucks.

15. ¶At the trial in October of 1997, Azure testified he was severely depressed over the divorce and that he was under extreme emotional stress when he shot at the house. Azure explained that he had intended only to shoot out the windows, and that he did not know John was standing at the window when he fired the first shot.

16. ¶During the trial, witnesses characterized Azure as being depressed, under a lot of stress, and very withdrawn just prior to the shooting on February 13, 1997. A legal secretary for Azure's attorney testified that Azure did not want to get divorced, and was constantly crying when he was at his attorney's office. She also admitted that on February 12, 1997, when she saw Azure, he told her he was drunk, and on February 13, the day of the shooting, she smelled alcohol on Azure when he came to sign the divorce papers at 10:30 a.m.

17. ¶Deborah Morris (Morris), Azure's daughter, testified that on the night of the shooting, Azure called her around 10:00 p.m. Azure was upset and crying and indicated he wished Lois would talk to him. Azure also told Morris he intended to kill himself, and that he wanted Fred, Lois' brother, to quit messing with him. When Azure called Morris back five minutes later, all he did was cry. During her testimony, the State questioned Morris about previous statements she made to Detective Bellusci concerning threats Azure made about Fred, but Morris denied making those statements. Azure denied ever threatening Fred or John Cavill.

18. ¶James Donahue (Donahue), a Deputy County Attorney who handles involuntary commitments, testified that in January, 1997, Lois called him and relayed concerns she had about Azure's mental health and behavior. Donahue testified that he talked to Azure's daughter, Morris, about similar concerns, and that both women frequently called his office about the matter. Donahue explained he did not take any steps to have Azure committed because the information he received indicated Azure's problems were with alcohol, and the county attorney's office only handles commitments for people with psychiatric illness. Donahue never spoke with Azure personally.

19. ¶Azure testified that after being served divorce papers on January 6, 1997, he was very depressed and suicidal, and he drank a considerable amount during that day. He admitted breaking into the house and pointing a gun at Lois, but denied the gun was loaded, or that he intended to hurt Lois. He said he used the gun to make her talk to him, and admitted he told Lois he had one shell for her and one for him in the gun.

20. ¶Azure also admitted he drove by the house several times on February 13, and that he punctured the two trucks' tires due to his frustration with the divorce. According to Azure, he returned to the house after 10:00 p.m. to see if Lois and John were gone so he could sleep in the house rather than in his van. Azure said that after parking his van kitty corner from the residence, he sat for about 10 or 15 minutes, watching the house and crying. He then drove up to the house and parked his van with the driver's side closest to the house.

21. ¶Azure explained that he wanted to shoot out some windows in the house so it would be too cold for Lois and John to stay there that night. In his mind, Azure thought if he could not stay in the house, Lois and John should not be able to either. Azure testified that when he got out of his van, the kitchen light was on, but that he did not see John, nor was it his intention to shoot John. Azure testified that when he shot at the kitchen window he was approximately 20 or 25 feet away and that he was crying pretty hard and everything was blurry. He then shot twice at the dining room window, but it did not break. While walking toward the window to break it, Azure saw Officer Otto, and got into his van and left. Azure said he drove towards the river, because he wanted to kill himself.

22. ¶At the trial, Dr. Michael Scolatti (Scolatti), a clinical psychologist, testified as to Azure's psychological condition the night of the shooting. Scolatti testified that Azure did not develop the typical coping strategies that are developed during childhood, and explained that Azure was clinically depressed for two months prior to the shooting, which was exacerbated when he would drink. According to Scolatti, Azure felt powerless and hopeless about his marriage ending, especially since he could not talk to Lois. The high level of stress and depression that Azure experienced, according to Scolatti, eroded his ability to make good decisions, think clearly, or concentrate on problems.

23. ¶Scolatti also diagnosed Azure with avoidant personality disorder, which relates to how a person interacts with others; in Azure's case it meant he felt inadequate and at fault for the divorce, while still holding out hope for reconciliation. According to Scolatti, factors such as Lois leaving, signing the divorce papers, and not being able to get into the house that night, were all "provocations" to the shooting. Scolatti testified that in his opinion, Azure was under extreme emotional distress during the period of time leading up to the shooting that affected his ability to function and make sound decisions. Scolatti noted these factors as the main contributors: the divorce, and Azure's clinical depression, physical disability, and avoidant personality disorder. Scolatti stated that in his opinion, on the night of the shooting Azure could have acted purposely or knowingly, but that he did so under extreme

emotional distress.

24. ¶Dr. William Stratford (Stratford), a forensic psychiatrist, testified for the State as to Azure's emotional state the night of the shooting. Stratford testified that although Azure was acting under some stress at the time of the offense, in his opinion, Azure was not under extreme emotional stress. Stratford explained that in his opinion, Azure did not "snap" the night of the shooting, but rather there were certain behaviors and choices that led up to the events. Stratford testified that Azure met the criteria for alcoholism and some broad form of depression. Stratford also agreed that Azure was not suffering from any mental impairment that prevented him from acting purposely or knowingly at the time of the offense.

25. ¶Following the trial, the jury convicted Azure on Counts I, deliberate homicide of John Cavill, and III, criminal mischief, but on Count II, found Azure guilty of the lesser offense, mitigated attempted deliberate homicide of Lois Cavill.

26. ¶On November 5, 1997, Azure filed a Motion for New Trial or Modified Verdict, wherein he argued in part that the guilty verdict of deliberate homicide was inconsistent with the reduced guilty verdict of mitigated attempted deliberate homicide. Following a hearing on December 8, 1997, and after considering the parties' briefs and arguments, the District Court denied Azure's motion for a new trial or modified verdict.

27. ¶On December 9, 1997, Azure was sentenced to 110 years for deliberate homicide with the use of a weapon; 12 years for mitigated attempted deliberate homicide with the use of a weapon; and 6 months for criminal mischief, with all sentences to run consecutively. Azure's appeal followed.

## STANDARD OF REVIEW

1. ¶The standard of review that applies to a district court's denial of a motion for directed verdict in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 1999 MT 297, ¶ 19, 297 Mont. 111, ¶ 19, 991 P.2d 929, ¶ 19 (citation omitted). We deem a motion for judgment notwithstanding the verdict as a motion for a new trial made under § 46-16-702, MCA, and our standard of review of a district court's ruling on a motion for new trial is whether the district court abused its discretion. *State v. Bell* (1996), 277 Mont. 482, 485, 923 P.2d 524, 526 (citation omitted).

## DISCUSSION

# Issue 1

1. ¶**May Azure's allegation of an unlawful jury impanelment be reviewed on direct appeal when no objection was raised at trial?**

2. ¶Azure claims that his jury impanelment was defective under *State v. LaMere*, 2000 MT 45, 298 Mont. 358, 2 P.3d 204, wherein we held the clerk's procedure for impaneling the jury did not comply with Montana law, and remanded the case for a new trial. Azure argues that because he was tried two months after LaMere and in the same District, "it was highly probable that Azure's jury was impanelled in the same illegal manner." Azure asks this Court to remand this case for fact-finding on this issue, since there was no record made as to how the jury was gathered.

3. ¶The State counters that Azure waived this claim for the purposes of appellate review when he failed to make a record of the procedure used to impanel the jury. The State argues it would be improper for this Court to remand for fact finding on the issue, noting it would undermine the rules regarding contemporaneous objections.

4. ¶Azure acknowledges his allegations of improper jury impanelment are raised for the first time on appeal. Failure to make a timely objection during trial constitutes a waiver of the objection except as provided in § 46-20-701(2), MCA. Section 46-20-104(2), MCA. However, Azure argues that under the plain error doctrine this Court has the discretion to review this issue since it concerns a manifest miscarriage of justice.

5. ¶ In *LaMere*, we reversed the District Court's denial of defendant's motion to strike the jury panel after considering affidavits and statistical evidence which revealed the potential for bias in the jury selection technique used by the clerk of court. *LaMere*, ¶¶ 6-9. Based on the record before us, we concluded the process of using the telephone to summon prospective jurors into court did not comply with the statute governing impanelling of a trial jury, and therefore vacated LaMere's conviction and remanded the case for retrial. *LaMere*, ¶¶ 75-76.

6. ¶In *Sate v. Highpine*, 2000 MT 368, 303 Mont. 422, 15 P.3d 938, and *State v. Lopez*, 2001 MT 97, 305 Mont. 218, 26 P.3d 745, we applied our holding from *LaMere*, and found the district court in both cases erred by denying the defendants' motions to strike the jury panel. *See Highpine*, ¶ 41 and *Lopez*, ¶¶ 16-17. In both cases, the record demonstrated the jury was summoned by telephone. See *Highpine*, ¶ 39, and *Lopez*, ¶ 11.

7. ¶Azure argues that the Clerk of the Eighth Judicial District Court, "commonly summoned [eligible jurors] to court by telephone," and that this impaneling procedure was the "standard practice in the Eighth Judicial District Court during 1997 and 1998." Azure also asserts the "court knew the statutes were not being followed by the clerk of court . . . ."

8. ¶However, Azure cites to nothing in the record concerning the actual procedure used by the clerk in summoning the jury panel or any evidence of potential prejudice based on the method of summoning the jury. It is axiomatic that this Court will not consider "evidence" not contained in the record on appeal. *State v. Spina*, 1999 MT 113, ¶ 17, 294 Mont. 367, ¶ 17, 982 P.2d 421, ¶ 17 (citation omitted). Moreover, this Court's review of allegations on direct appeal is confined to the record. *State v. Henry* (1995), 271 Mont. 491, 496, 898 P.2d 1195, 1198 (citations omitted). *See also*, *State v. Mix* (1989), 239 Mont. 351, 361, 781 P.2d 751, 757 (citations omitted) ("We have long held to the principle that an appellate court in reaching its decision will only consider material ascertainable from the record."). Accordingly, we cannot simply rely on Azure's allegations of improper jury impanelment procedure.

9. ¶Azure asks this Court to remand this case for a determination of what method the clerk of court used in summoning the jury. However, remanding for a hearing is not a proper remedy for an appeal on direct review, since an evidentiary hearing "can only be accomplished in a postconviction proceeding." *State v. Whitlow*, 2001 MT 208, ¶ 38, 306 Mont. 339, ¶ 38, 33 P.3d 877, ¶ 38 (Nelson, J., specially concurring and dissenting). *See also State v. St. John*, 2001 MT 1, ¶ 40, 304 Mont. 47, ¶ 40, 15 P.3d 970, ¶ 40, *overruled on other grounds by State v. Brister*, 2002 MT 13, ___ Mont. ___, ___ P.3d ___ (when the record does not provide the basis for the challenged acts or omissions of counsel, a defendant's claim for ineffective assistance of counsel is more appropriately brought as a petition for postconviction relief). Because we cannot determine from the record what procedure the clerk of court used in summoning the jury, we decline to review this issue further.

10. ¶Finally, we will not review Azure's claim pursuant to the plain error doctrine, as there is no record before us to determine whether an error occurred, let alone if the error met the criteria of the plain error doctrine under common law or § 46-20-701, MCA.

## Issue 2

1. **¶May Azure's allegations of prosecutorial misconduct be reviewed on appeal when no objection to the conduct was raised at trial?**

2. ¶Azure argues the State committed prosecutorial misconduct by introducing "false evidence" during the trial concerning threats Azure allegedly made toward Fred Cavill. Azure contends the State's introduction of testimony from Morris that Azure had made threats toward Fred Cavill was "false evidence," since Morris denied telling the detective Azure had made the threat the night of the shooting. Azure argues the State again introduced this "false evidence" when it asked Azure about the statements, even though Azure said he did not remember making the statements. Significantly, Azure admits no objections to this "false evidence" were made during Morris' testimony.

3. ¶The State contends nothing in the record indicated the State introduced false testimony or forced Azure to speculate as to statements he made about Fred Cavill. The State argues that Azure is precluded from raising this issue on direct appeal since he failed to make contemporaneous objections at trial.

4. ¶Specific objections must be made to portions of testimony deemed inappropriate. *State v. Courchene* (1992), 256 Mont. 381, 385, 847 P.2d 271, 273 (citation omitted). Failure to make a timely objection during trial constitutes a waiver of the objection except as provided in § 46-20-701(2). Section 46-20-104(2), MCA. "[W]here a criminal defendant fails to make a contemporaneous objection to the prosecution's characterization of the facts during trial, this Court is precluded 'from addressing an issue under § 46-20-104(2), MCA, unless the criteria under § 46-20-701(2), MCA, can be met or the comments create an exception under the plain error doctrine.' " *State v. Stuit* (1994), 268 Mont. 176, 182, 885 P.2d 1290, 1294 (citation omitted). *See also State v. Rogers* (1993), 257 Mont. 413, 419, 849 P.2d 1028, 1032 (citation omitted) (When the district court was not given an opportunity to rule on the admission of a statement or to correct itself if admission was not proper, "[w]e will not put the trial court in error where it has not been given such a chance"). For an objection to be contemporaneous and thus preserve an appeal, it must be "made at trial in a timely manner and upon specific grounds, which appear on the record, and which is made as soon as the ground for the objection becomes apparent." *Stuit*, 268 Mont. at 182, 885 P.2d at 1294 (citations omitted). Azure did not object at any time to Morris' testimony on direct examination or to Azure's testimony on cross examination. Nor has Azure argued that the plain error doctrine should apply to this issue.

5. ¶Therefore, we conclude Azure waived his right to an appellate review of his claims regarding prosecutorial misconduct arising out of the statements Azure allegedly made to Morris.

# Issue 3

1. ¶**Did the District Court err when it denied Azure's motion for a modified verdict?**

2. ¶Azure argues that the District Court erred when it denied his motion for a modified verdict. Azure had asserted that the jury's verdict on deliberate homicide was logically and legally inconsistent with the verdict of mitigated attempted deliberate homicide. Azure contends that once the jury concluded Azure was acting under extreme stress at the time he shot at the dining room window, it had to likewise conclude that Azure was also under extreme stress when he shot at the kitchen window, seconds earlier, killing John. The State argues that this Court should not second-guess a jury verdict, and that inconsistencies are allowed in verdicts.

3. ¶ We have held that "where separate acts are charged in an information, and each act is a separate offense, an acquittal or conviction of one or more counts does not affect the other counts." *State v. Sanderson* (1985), 214 Mont. 437, 451, 692 P.2d 479, 487 (citation omitted). In cases where the sufficiency of the evidence is considered, we will not substitute our judgment for that of the jury, which is "able to view firsthand the evidence presented, observe the demeanor of the witnesses, and weigh the credibility of each party." *Sanderson*, 214 Mont. at 452, 692 P.2d at 487. *See also*, *State v. Larson* (Minn. 1979), 281 N.W.2d 481, 487 (It is within the jury's prerogative to find a defendant guilty of four homicides, but find that he lost his ability to distinguish right from wrong when he fatally shot the last victim).

4. ¶Moreover, we will not attempt to ascertain what the jury actually determined. *See Dallas v. Arave* (9th Cir. 1993), 984 F.2d 292, 295. "If the circumstances reasonably justify the verdict, this Court must assume the existence of every fact which the jury reasonably could have deduced from all the evidence." *State v. Doney* (1981), 194 Mont. 22, 33, 636 P.2d 1377, 1384 (citation omitted). Whether Azure acted under extreme emotional distress was a question of fact for the jury. *See State v. Sunday* (1980), 187 Mont. 292, 301, 609 P.2d 1188, 1194 (citation omitted).

5. ¶A rational trier of fact could have found Azure was not under extreme emotional stress when he shot John Cavill, particularly if the jury concluded Azure could in fact see John in the window when he fired the shot. The evidence presented to the jury concerning Azure's emotional stressors predominantly revolved around his relationship with Lois--her leaving him, Azure not being able to talk to her, and the signing of the divorce papers. The jury could have reasonably concluded there was mitigation in Azure's acts toward Lois, but not in his actions toward John. After all,

the jury heard evidence that Azure could in fact see John in the window prior to firing the first shot. They also heard Azure testify that the statements he made in the holding cell and his "heart attack" were the result of being told he was charged with "first degree homicide;" however, they also heard testimony that Azure was not informed of John's death at the time. The jury also viewed the tape of Azure in the holding cell, where he does not mention shooting any windows at all, and there is no discussion by either Azure or any officer as to why Azure was arrested. Further, Azure's statements on the holding cell tape oscillated between saying he did not know what happened to statements such as, " I can't believe I'd do something like this;" and "I'm right in the middle of getting a divorce, this is what this is all about."

6. ¶For a charge of deliberate homicide to be reduced to mitigated deliberate homicide, "the jury must be convinced by a preponderance of the evidence that such reduction is warranted, in accordance with § 45-5-103, MCA." *State v. Byers* (1993), 261 Mont. 17, 36, 861 P.2d 860, 872, *overruled on other grounds by State v. Egelhoff* (1995), 272 Mont. 114, 900 P.2d 260 and *State v. Rothacher* (1995), 272 Mont. 303, 901 P.2d 82. Section 45-5-103, MCA, provides in part:

(1) A person commits the offense of mitigated deliberate homicide when the person purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse. The reasonableness of the explanation or excuse must be determined from the viewpoint of a reasonable person in the actor's situation. [Emphasis added.]

1. ¶The jury could have logically concluded there was no reasonable explanation or excuse for Azure to shoot at John, while also concluding there was a reasonable explanation for Azure's actions towards Lois. Thus, we conclude the jury verdicts are not legally or logically inconsistent. Therefore, the District Court did not err when it denied Azure's motion for a modified verdict.

2. ¶Accordingly, we affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON

/S/ JIM REGNIER